[978 NE2d 1231, 954 NYS2d 763]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WESTERN EXPRESS INTERNATIONAL, INC., et al., Defendants, and DOUGLAS LATTA et al., Appellants.

Argued September 5, 2012; decided October 18, 2012

**POINTS OF COUNSEL**

*Douglas Latta*, pro se, and *Center for Appellate Litigation*, New York City (*Jan Hoth* and *Robert S. Dean* of counsel), for Douglas Latta, appellant. Where appellant's web-based activities were based on ad hoc associations and not part of an "ascertainable structure," the evidence before the grand jury failed to establish the existence of a criminal enterprise under Penal Law § 460.10 (3) and thus, the Appellate Division erroneously reinstated the previously dismissed "enterprise correction" count. (*People v Bello*, 92 NY2d 523; *People v Jennings*, 69 NY2d 103; *People v Galatro*, 84 NY2d 160; *People v Pelchat*, 62 NY2d 97; *People v Besser*, 96 NY2d 136; *People v Wakefield Fin. Corp.*, 155 Misc 2d 775; *People v Cantarella*, 160 Misc 2d 8; *People v Yarmy*, 171 Misc 2d 13; *People v Conigliaro*, 290 AD2d 87; *Boyle v United States*, 556 US 938.)

*Marianne Karas*, Thornwood, for Vadim Vassilenko, appellant. The Appellate Division erroneously reinstated the previously dismissed "enterprise corruption" count where the grand jury evidence failed to establish defendant's participation in a criminal enterprise. (*People v Yarmy*, 171 Misc 2d 13; *People v Wakefield Fin. Corp.*, 155 Misc 2d 775; *People v Cantarella*, 160 Misc 2d 8; *People v Pustilnik*, 14 Misc 3d 1237[A], 2007 NY Slip Op 50407[U]; *People v Moscatiello*, 149 Misc 2d 752.)

*Steven Banks, Legal Aid Society*, New York City (*Allen Fallek* of counsel), for Lyndon Roach, appellant. The Appellate

Division erroneously reinstated the previously dismissed "enterprise corruption" count where the grand jury evidence failed to establish appellant's participation in a criminal enterprise that had an "ascertainable structure." (*Boyle v United States*, 556 US 938; *People v Newspaper & Mail Deliverers' Union of N.Y. & Vicinity*, 250 AD2d 207; *People v Besser*, 96 NY2d 136; *United States v Turkette*, 452 US 576; *People v Conigliaro*, 290 AD2d 87; *People v Yarmy*, 171 Misc 2d 13; *People v Moscatiello*, 149 Misc 2d 752; *People v Manini*, 79 NY2d 561.)

*Galluzzo & Johnson LLP*, New York City (*Matthew J. Galluzzo* of counsel), for Angela Perez also known as Anna Ciano, appellant. The evidence before the grand jury was insufficient to sustain the charge of enterprise corruption. (*People v Pustilnik*, 14 Misc 3d 1237[A], 2007 NY Slip Op 50407[U]; *People v Wakefield Fin. Corp.*, 155 Misc 2d 775; *People v Moscatiello*, 149 Misc 2d 752; *People v Cantarella*, 160 Misc 2d 8; *People v Capaldo*, 151 Misc 2d 114; *Odom v Microsoft Corp.*, 486 F3d 541; *United States v Turkette*, 452 US 576; *United States v Patrick*, 248 F3d 11; *United States v Cagnina*, 697 F2d 915; *Richmond v Nationwide Cassel L.P.*, 52 F3d 640.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*David M. Cohn* and *Alan Gadlin* of counsel), for respondent. The evidence before the grand jury sufficiently established the existence of a criminal enterprise. (*People v Grant*, 17 NY3d 613; *People v Bello*, 92 NY2d 523; *People v Garson*, 6 NY3d 604; *People v Jennings*, 69 NY2d 103; *People v Besser*, 96 NY2d 136; *Boyle v United States*, 556 US 938; *United States v Turkette*, 452 US 576; *United States v Lemm*, 680 F2d 1193; *People v Graziano*, 34 AD3d 597; *People v Conigliaro*, 290 AD2d 87.)

## OPINION OF THE COURT

Chief Judge LIPPMAN.

Appellants have been indicted for enterprise corruption (Penal Law § 460.20 [1] [a]), a class B felony, based in essential part on their commission of numerous predicate offenses.[1] There was proof before the grand jury that three of them—Douglas Latta, Lyndon Roach and Angela Perez—repeatedly purchased stolen

---

1. These included scheme to defraud, conspiracy, grand larceny, money laundering, possession of stolen property, and falsifying business records. No issue is before us respecting the sufficiency of the counts charging these offenses; this appeal concerns no more than the sufficiency of the evidence offered in support of the enterprise corruption count.

credit card data which they then used for fraudulent purposes, and that the remaining appellant, Vadim Vassilenko, through the company he controlled, defendant Western Express International, Inc. (Western Express), facilitated transactions by which the purloined credit card data was transferred.

Appellants' conduct, the People claim, was part of a larger enterprise to traffic in stolen credit card information. To make out the corrupt enterprise, the People adduced before the grand jury proof that Eastern European vendors of stolen credit card data engaged in Internet transactions with buyers in New York. There was also proof that, in consummating these transactions, buyers and sellers sometimes availed themselves of services offered by Western Express through its publicly accessible Internet websites. While Western Express's menu of services—i.e., check cashing, mail receiving, issuing money orders, digital currency exchange, and Russian/English translation—was superficially unremarkable, the services themselves being legal and admitting of legitimate utility in the conduct of international transactions, there was evidence that some Western Express customers, among them defendants Latta, Roach and Perez, used the company's services for "carding" purposes, i.e., to traffic in stolen credit card information.

The People, in presenting the matter to the grand jury, dwelt principally on the carders' use of Western Express's digital currency exchange service. Western Express, having purchased large sums of the unregulated Internet currencies EGold and Webmoney, was an authorized vendor of those forms of tender. For a commission of between two and five percent, the company would transfer into a customer Internet account held in an assumed name digital currency purchased from it by the customer with US dollars. The digital currency could then be, and on occasion was, transferred to pay for stolen credit card information, after which the vendor would sell the digital currency received in payment back to Western Express for its value in another digital currency or US dollars, with Western Express taking an additional commission. This transactional pattern recommended itself for money laundering purposes by reason of the circumstance that E-currency was not government regulated and that international transactions using it went largely unscrutinized.

There was evidence that Western Express was not a neutral observer of this use of its services; its employees offered advice on how to structure transactions to avoid detection and defendant

Vassilenko, the company's president, recognizing that a significant portion of Western Express's business was from "carding" transactions,[2] actively sought the patronage of carders. Carder business was encouraged by postings on the Western Express websites and there was proof that Vassilenko attempted (evidently unsuccessfully) to advertise Western Express's services on Carder Planet, a members-only website devoted exclusively to facilitating illegal carding activities.

Supreme Court granted appellants' respective motions to dismiss the subject indictment's enterprise corruption count upon the ground that the proof before the grand jury, even when viewed most favorably to the People, did not make out the existence of a "criminal enterprise." As is here relevant, guilt of enterprise corruption under New York's Organized Crime Control Act (OCCA) (Penal Law § 460.00 *et seq.*) requires proof that the accused "when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise . . . intentionally conducts or participates in the affairs of [the] enterprise by participating in a pattern of criminal activity" (Penal Law § 460.20 [1] [a]). For OCCA purposes a "criminal enterprise" is "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]). In dismissing the enterprise corruption count, Supreme Court focused upon the absence of proof of an "ascertainable structure distinct from a pattern of criminal activity":

> "Here, the People have failed to even articulate—
> much less adduce evidence proving—any system of
> authority or hierarchy in which the defendants
> participated . . . [W]hat the People allege are a
> series of arms-length business transactions—admittedly extensive and, if the People's allegations are
> true, illegal—conducted by a variety of organizations and individuals, each operating independently
> and with no overarching structure or system of
> authority. In essence, the People have described an
> illegal industry rather than a corrupt enterprise,

---

2. Vassilenko estimated that 5% of his business was from carding transactions. The People contend that the actual percentage was much higher.

the criminal parallel of a typical legitimate industry consisting of producers, wholesalers, distributors, retail outlets, and credit suppliers, each of [whom] has a unique but independent role in the industry."

In reversing and reinstating the enterprise corruption count (85 AD3d 1 [1st Dept 2011]), the Appellate Division, while acknowledging that there was no evidence of a traditionally structured, i.e., hierarchical, entity, theorized that Vassilenko had used Western Express to create a structured enterprise the purpose of which was to "actively encourage more and larger transactions by its participants on an ongoing basis" (*id.* at 14). The evidence, said the court, permitted the inference that defendants knowingly played roles in the enterprise even though, for the most part, they had no personal interaction (*id.*). Two Justices dissented, expressing the view that the requisite "ascertainable structure" to the alleged enterprise had not been demonstrated, even to the bare bones extent necessary to sustain the enterprise corruption count to trial. The dissenters found compelling the absence of "evidence of any collective decision-making or coordination with respect to the purported enterprise's activities or of any overarching structure of authority or hierarchy in which defendants participated" (*id.* at 19). One of the dissenting Justices granted appellants' separate applications for permission to appeal to this Court (2011 NY Slip Op 80670[U] [2011]; 2011 NY Slip Op 80671[U] [2011]; 2011 NY Slip Op 83743[U] [2011]; 2011 NY Slip Op 83744[U] [2011]). We now reverse and reinstate the orders of Supreme Court dismissing the enterprise corruption count as against appellants.

New York's OCCA was enacted in 1986 to afford state prosecutors a means of exacting heightened penalties for criminal activity referable to or generative of structured criminal enterprises (*see* Penal Law § 460.00). Those enterprises were understood to present a distinct evil by reason of their unique capacity to plan and carry out sophisticated crimes on an ongoing basis while insulating their leadership from detection and prosecution (*see id.*; *People v Besser*, 96 NY2d 136, 142 [2001]). The Federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USC § 1961 *et seq.*) had, of course, for some time enabled federal prosecutors to prosecute enterprise corruption as such, but until the enactment of the OCCA there was no New York State analogue.

The common challenge posed both federal and state legislators in penalizing enterprise corruption as a separate crime was

to delineate the circumstances under which conduct already fitting under a criminal definition would additionally be subject to prosecution and more serious penalization for its connection to a criminal organization. To justify the superadded penalties for participation in a corrupt enterprise, and concomitantly to avoid sweeping relatively minor offenders into complex multidefendant, multicount prosecutions entailing a risk of draconian punishment, it was necessary to distinguish between what on the one hand were merely patterns of criminal conduct and what on the other were patterns of such conduct demonstrably designed to achieve the purposes and promote the interests of organized, structurally distinct criminal entities. Accordingly, both RICO and the OCCA require the prosecution to prove, in addition to a pattern of criminal activity, the existence of a separate criminal enterprise to which that pattern of activity is beneficially connected (*see United States v Turkette*, 452 US 576, 583 [1981]; Penal Law §§ 460.20 [1]; 460.10 [3]). While RICO does not explicitly require proof of the enterprise's structural integrity, it is settled that a qualifying enterprise must have structure (*Boyle v United States*, 556 US 938, 940-941 [2009]). And, as noted, the OCCA, which is assertedly of more narrow application than RICO (Penal Law § 460.00),[3] makes the requirement of "an ascertainable structure distinct from a pattern of criminal activity" express in its definition of "criminal enterprise" (Penal Law § 460.10 [3]). Both statutes demand or have been understood to demand proof of an association possessing a continuity of existence, criminal purpose, and structure—which is to say, of constancy and capacity exceeding the individual crimes committed under the association's auspices or for its purposes (*id.*; *Boyle*, 556 US at 946).

There is no question that the People presented as to each appellant considerable evidence of a pattern of illegal activity. The issue to be decided is whether they also presented evidence from which a petit jury could reasonably infer (*see People v Bello*, 92 NY2d 523, 525 [1998]) that that activity bore the

---

3. As is here relevant the legislature in enacting the OCCA was careful to explain that

"[t]he organized crime control act is a statute of comparable purpose [to that of RICO] but tempered by reasonable limitations on its applicability, and by due regard for the rights of innocent persons. *Because of its more rigorous definitions*, this act will not apply to some situations encompassed within comparable statutes in other jurisdictions" (Penal Law § 460.00 [emphasis supplied]).

requisite relation to a distinct criminal enterprise—a "group of persons" seeking a "common purpose" and associated in an ascertainably structured entity. The People and the Appellate Division majority proposed a structure composed of buyers and sellers of stolen credit card information arrayed around Western Express's hub-like websites, drawn there by reason of the sites' menu of facilitative services. As Supreme Court perceptively observed, however, this does no more than describe a prevalent pattern evidently organic to the "carding" market; it is how that business often happens to be configured given the needs and interests of the individual market participants. It is, however, not indicative of a distinct, structured criminal enterprise. There is no hint that any of the market participants acted except for and according to their own particular interests,[4] much less that their actions within the illicit market were somehow connected to the workings of a structured, purposeful criminal organization.

The People urge that a criminal enterprise need not be hierarchical to be structured and that structure may be inferred from patterns of criminal conduct. While both of these propositions may be true in theory, it remains that under the OCCA a "common purpose" is required and the structure of a criminal enterprise must be "ascertainable." Here these conditions are not met. The presented evidence was indicative of no more than the manner in which international transactions in stolen credit card data were commonly conducted, with or without the use of Western Express's services;[5] it did not support the further inference of a distinct, beneficially related criminal enterprise.

It is true that in *Boyle* the RICO requirement of enterprise structure was deemed satisfied simply by proof of the underlying pattern of criminal activity and the inference of structure that that proof would bear (*see* 556 US at 947-948). The OCCA, unlike RICO, however, specifically demands that the structure be distinct from the predicate illicit pattern, and not surprisingly there are no New York cases in which the requisite

---

4. We note that, while the Appellate Division offered that the common purpose of the purported enterprise was to encourage more and larger criminal transactions, there was no proof that Western Express's customers availed themselves of the company's services with any objective other than the expedient conduct of their own individual transactions.

5. There are numerous providers of such services and, in fact, after Western Express's demise, its carder clientele simply switched to different providers of comparable services.

structure has been inferred simply from an underlying pattern. Moreover, *Boyle* involved a ring of thieves whose relatively constant membership met from time to time to plan and execute bank heists, the proceeds of which they shared (*see id.* at 941). There was, then, some evidence from which a continuing cooperative criminal enterprise possessed of a common purpose and some, albeit loose, structure could be inferred. Here, although there was evidence of many arms' length transactions, there was no proof of concerted activity from which a petit jury might reasonably have gathered that the appellants were knowing participants in the affairs of a "criminal enterprise" within the meaning of Penal Law § 460.10 (3).

Doubtless, the Internet may be used to facilitate crime, and we do not exclude the possibility that a website singularly preoccupied with processing a screened clientele's illicit transactions could be understood as elemental to and reflective of a criminal enterprise. But crimes committed by resort to cyber means are not invariably referable to distinct nefarious enterprises, and the websites here involved do not permit the inference of an overarching criminal purpose or organization; while Western Express may have sought to make its websites attractive to carders, the sites themselves presented simply as publicly accessible loci for the conduct of business, the legality of which turned in the end upon the independent agendas of individual users. To the extent that the usage was for illegal purposes, it reflected the existence of a prevalent black market but did not reasonably justify the additional inference necessary to the viability of the proposed enterprise corruption prosecution, that there was within that market an enduring structurally distinct symbiotically related criminal entity with which appellants were purposefully associated.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed and the orders of Supreme Court, New York County, dismissing the enterprise corruption count of the indictment as against appellants, reinstated.

PIGOTT, J. (dissenting). The days of traditional organized crime families seem to be fading. Instead, in today's modern world, criminal organizations now vary in size and even operate on a global span by way of the computer. Criminal organizations operating on the Internet do so without any notion of a hierarchy or any formalized decision-making process. The New York State Legislature, recognizing that organized crime is evolving,

has expressly permitted courts and prosecutors to apply the enterprise corruption statute (Penal Law § 460.20 [1] [a]), in their discretion, to organizations that engage in a pattern of criminal activity and that possess any sort of "ascertainable structure" (see Penal Law § 460.00).

The majority correctly summarizes the grand jury presentation by the People, noting the following: (1) defendant Western Express purchases "large sums of the unregulated Internet currenc[y]"; (2) it then transfers this money to customers with "assumed name" accounts; (3) those "customers" then buy stolen credit card information with this unregulated money; and (4) the "customer" then sells the currency back to Western Express obtaining U.S. dollars in return with Western Express taking an additional commission (majority op at 655). As the majority notes, this is simply a digital form of money laundering.

My colleagues conclude that no "ascertainable structure" was presented to the grand jury in this case because, although there was a "prevalent black market" for stolen credit card information, within that market there was no "enduring structurally distinct symbiotically related criminal entity with which appellants were purposefully associated" (majority op at 660). I find no such requirement in the statute.

The People allege that a cybercrime group (which the People termed the Western Express Cybercrime Group), was formed. The group included a preexisting corporation, Western Express International, Inc., that acted as the "money mover" for the other members of the group. Those other members included "vendors" and "buyers" who trafficked in stolen credit card numbers and other stolen personal identifying information.

The group acted with a common purpose to engage in conduct constituting the crime, among others, of trafficking stolen information, while avoiding detection by law enforcement. Specifically, the vendors and buyers, through Western Express, were permitted to conduct anonymous transactions, via the Internet and by other means, using sophisticated payment schemes. Western Express further assisted the buyers and vendors by helping structure the transactions to avoid federal reporting requirements. For instance, via computer, Western Express employees advised certain members to structure wire transfers in small amounts under various names. Thus, although the members had their own self-interest to profit from the criminal activity, they also acted for the benefit of both the vendors and buyers. Indeed, all of the participants of the group were acting

together for the intended result and common goal of ensuring that all parties to and proceeds of the transactions remain virtually untraceable.

The purpose in enacting the enterprise corruption statute "was to address the particular and cumulative harm posed by persons who band together in complex criminal organizations" (*People v Besser*, 96 NY2d 136, 142 [2001]). Here, Western Express and the other group members banded together in a way that was distinct from a simply buy-sell transaction on the black market. Rather, the parties acted in an organized way, or, in other words by an "ascertainable structure," which allowed the members to be more successful in effecting their criminal purpose and to avoid detection from law enforcement for several years.

I would, therefore, affirm the order of the Appellate Division.

Judges CIPARICK, GRAFFEO, READ, SMITH and JONES concur with Chief Judge LIPPMAN; Judge PIGOTT dissents and votes to affirm in a separate opinion.

Order, insofar as appealed from, reversed, etc.