People v Jones (2018 NY Slip Op 08058)

People v Jones

2018 NY Slip Op 08058 [32 NY3d 1146]

November 27, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 6, 2019

[*1]

The People of the State of New York, Respondent,
v
Damian Jones, Appellant.

Argued October 16, 2018; decided November 27, 2018.

People v Jones, 149 AD3d 407, reversed.

APPEARANCES OF COUNSEL

Holwell Shuster & Goldberg LLP, New York City (Scott M. Danner of counsel), and Office of the Appellate Defender, New York City (Christina A. Swarns and Rosemary Herbert of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York City (Ross D. Mazer and David M. Cohn of counsel), for respondent.
White & Case LLP, Washington, D.C. (Dana Foster of counsel), Robert S. Dean, Center for Appellate Litigation, New York City, New York State Association of Criminal Defense Attorneys, White Plains (Richard D. Willstatter of counsel), and Chief Defenders Association of New York, Bronx (Leanne G. Lapp of counsel), for Center for Appellate Litigation and others, amici curiae.

{**32 NY3d at 1147} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be reversed and the indictment dismissed.
Defendant was convicted, upon a jury verdict, of enterprise corruption as defined by Penal Law § 460.20—the single count filed against him in the indictment. For purposes of this appeal{**32 NY3d at 1148} only, we assume, without deciding, that the People established the existence of a criminal enterprise. Viewing the evidence in the light most favorable to the People, as we must (People v Contes, 60 NY2d 620, 621 [1983]), the proof elicited at trial was not legally sufficient to establish the elements of defendant's knowledge of the existence of the subject criminal enterprise and the nature of its affairs or his intent to participate in such affairs (Penal Law § 460.20 [1] [a]).
On the mens rea element, the People were required to prove, beyond a reasonable doubt, that defendant, "having knowledge of the existence of a criminal enterprise and the nature of its activities," and, "being employed by or associated with such enterprise . . . intentionally conduct[ed] or participate[d] in the affairs of an enterprise" (Penal Law § 460.20 [1] [a]). Consistent with this statutory mens rea requirement, the trial court additionally instructed the jury, without objection, that the People were required to show that defendant had "chosen to be part of the group and to have worked as a member of it or in affiliation with it to achieve its criminal purposes."
[*2]
Here, the evidence of defendant's knowledge of the existence of the criminal enterprise and his intention to participate in its affairs fell short as a matter of law. The evidence of defendant's participation in the three requisite criminal acts included in the pattern activity alone does not establish defendant's knowledge of the existence of the criminal enterprise and the nature of its activities. In addition, the critical trial testimony of the People's cooperating witness demonstrated that defendant was isolated from—rather than employed by or associated with—the enterprise, and that defendant acted independently on his own behalf, with the singular purpose of serving his own interests.
In light of this determination, defendant's remaining contentions are academic.

Rivera, J. (concurring). The People prosecuted defendant Damian Jones for enterprise corruption under New York State's Organized Crime Control Act (OCCA) on evidence that he stole four motorcycles for resale by other criminal actors, independent of the commands of any organization, without direction from a superior or upon a demand by his cohorts. In other words, the evidence showed that defendant acted in pursuit of his individual interest in the money to be made from an illicit market in stolen property, of his own volition, and not as part{**32 NY3d at 1149} of an association with a purpose separate from the criminal acts he and others committed. Whatever else that evidence proved, the one thing it did not establish was defendant's participation in a criminal enterprise.
As its name suggests, the purpose of the Organized Crime Control Act is to prevent and eliminate organized crime, a pernicious system of criminal action which is difficult to prosecute under existing laws because it involves a complex organizational structure which insulates its upper echelon members. The legislative findings confirm that the distinguishing features of the OCCA's target enterprise is membership in an organization with an ascertainable structure distinct from the underlying criminal conduct, and a hierarchy of authority or a system of ascending command which directs and approves the members' actions. Yet, here there was no evidence of such structure and no evidence that defendant is a "kingpin," "boss," "soldier," or superior in a criminal organization, or a low-level participant in a defined criminal structure that exists apart from the sale of stolen motorcycles. The evidence made him out to be a motorcycle thief, the type of common criminal individually prosecuted every day without the need for prosecutorial resort to the OCCA.[FN1] [*3]I.
New York State's Organized Crime Control Act of 1986
A. Legislative Findings and Statutory Purpose
By the 1980s, the legislature crafted a state-based response to the growing threat of organized crime in New York and its expanding corruptive influence over lawful institutions. After years of debate, the legislature enacted the Organized Crime Control Act of 1986, which created the new crime of "enterprise corruption" with enhanced incarceratory penalties (see Penal Law § 460.00 et seq.; Feldman letter, Bill Jacket, L 1986, ch 516 at 5 ["As you know, I have carried this legislation for the past four years and, during that time it has been one of my{**32 NY3d at 1150} highest legislative priorities in the fight against organized crime"]).[FN2]
As described in the legislative findings, which are expressly incorporated into the OCCA, organized crime "involves highly sophisticated, complex and widespread forms of criminal activity" and "threatens the peace, security and general welfare of the people of the state" (Penal Law § 460.00). Through money and influence, criminal organizations not only establish illegal operations but also infiltrate "businesses, unions and other legitimate enterprises," diverting their focus to criminal ends (id.).
Typical Penal Law provisions are ineffective at preventing and eliminating organized crime, as these statutes "are primarily concerned with the commission of specific and limited criminal acts without regard to the relationships of particular criminal acts or the illegal profits derived therefrom, to legitimate or illicit enterprises operated or controlled by organized crime" (id.). In other words, the complex structure of the criminal enterprise shields high-level actors from prosecution, while exposing low-level actors to traditional criminal penalties, thus ensuring the continuity of the criminal organization with its attendant corruptive influence on society's institutions and the economy (see id.). Accordingly, the OCCA "focuses upon criminal enterprises because their sophistication and organization make them more effective at their criminal purposes and because their structure and insulation protect their leadership from detection and prosecution" (id.).
The legislative findings note that organized criminal structures can take many forms and "the concept of criminal enterprise should not be limited to traditional criminal syndicates or crime families" (id.). Thus, the OCCA also targets groups of persons working together within a similar framework of leadership control that proves efficient at expanding and diversifying its reach through legal and illegal enterprises.
In drafting the OCCA, the legislature considered the approach taken by Congress in the federal Racketeer Influenced and Corrupt Organization Act (18 USC § 1961 et seq.) (RICO). Recognizing that RICO and the state analogues inspired by its passage "provided law enforcement agencies with an effective tool to fight organized crime" (Penal Law § 460.00), the {**32 NY3d at 1151}legislature sought to draw on the strengths and successes of those laws, as well as from lessons learned during over a decade of RICO enforcement (see Donald J. Rebovich, Kenneth R. Coyle & John C. Schaaf, Local Prosecution of Organized Crime: The Use of State RICO Statutes at 1-2 [1993], Bureau of Justice Statistics, US Dept of Justice, available at https://www.bjs.gov/content/pub/pdf/lpocusricos.pdf; see generally John E. Floyd, RICO State By State: A Guide to Litigation under the State Racketeering Statutes [Am Bar Assn 2d ed 2011]; see e.g. NJ Rev Stat § 2C: 41-1 et seq.; Conn Gen Stat Ann § 53-393 et seq.; 18 Pa Stat and Cons Stat Ann § 911 et seq.).
By this time, several federal judges and scholars had criticized RICO for being overly expansive as applied, and bringing within its prosecutorial net criminal activity that did not pose the type of structural problems that RICO [*4]was intended to address: the infiltration of legitimate businesses and institutions by criminal organizations (see United States v Anderson, 626 F2d 1358, 1364 n 8 [8th Cir 1980] ["RICO has grown in popularity. Broad interpretation and simplistic resolution of the complicated statutory language pose the danger of enhancing this popularity beyond the intentions of Congress by bringing within the sphere of RICO minor offenses and by intruding on state power"]; United States v Huber, 603 F2d 387, 395-396 [2d Cir 1979] [warning "that the potentially broad reach of RICO poses a danger of abuse where a prosecutor attempts to apply the statute to situations for which it was not primarily intended"]; United States v Altese, 542 F2d 104, 107-111 [2d Cir 1976, Van Graafeiland, J., dissenting] ["The end result of the majority's expansive interpretation of (18 USC) § 1962(c) is to accord the word 'enterprise', intended by Congress to be synonymous with commercial business, parity with the term 'conspiracy' "]; Gerald E. Lynch, RICO: The Crime of Being a Criminal, Parts I & II, 87 Colum L Rev 661, 661-662 [1987] ["Congress viewed RICO principally as a tool for attacking the specific problem of infiltration of legitimate business by organized criminal syndicates . . . Instead, prosecutors have seized on the virtually unlimited sweep of the language of RICO to bring a wide variety of different prosecutions in the form of RICO indictments"]). It also faced criticism for prosecution of defendants with tenuous connections to larger criminal schemes (see Barry Tarlow, RICO: The New Darling of the Prosecutor's Nursery, 49 Fordham L Rev 165, 169-171, n 11 [1980]).{**32 NY3d at 1152}
New York's legislature sought to avoid these problems by limiting the OCCA's coverage as compared to RICO (see Daniel L. Feldman, Principled Compromise: The New York State Organized Crime Control Act, 6 Crim Just Ethics 50, 51 [1987] [noting the legislature was motivated by a concern that "RICO may be used to obtain convictions in mass trials of defendants who would not otherwise have been convicted, were it not for the prejudicial presence of their codefendants (because) such defendants need not know their codefendants, need not have worked toward a common specific criminal purpose with them, and in most jurisdictions apparently need not even have known of or benefited from their common participation in an overall organization"]). The OCCA's primary sponsor noted that the drafting process took "four years to refine the bill to the point at which it achieve[d] its purposes without raising some of the problems of fair trial for which the federal law (RICO) ha[d] been criticized" (Feldman letter, Bill Jacket, L 1986, ch 516 at 5; see id. [noting distinctions between the OCCA and RICO]).
Thus, while having a "comparable purpose" to RICO, the OCCA is "tempered by reasonable limitations on its applicability, and by due regard for the rights of innocent persons" (Penal Law § 460.00). As enacted and intended by the legislature, "[b]ecause of its more rigorous definitions, [the OCCA] will not apply to some situations encompassed within comparable statutes in other jurisdictions" (id.).[FN3] By design, the OCCA applies to a narrow category of crimes that may not be otherwise adequately addressed by the Penal Law (see People v Western Express Intl., Inc., 19 NY3d 652, 657-658 [2012] ["The common challenge posed both federal and state legislators in penalizing enterprise corruption as a separate crime was to delineate the circumstances under which conduct already fitting under a criminal definition would additionally be subject to prosecution and more serious penalization for its connection to a criminal organization"]).[FN4] {**32 NY3d at 1153}
B. [*5]Statutory Elements of "Enterprise Corruption"
A person is guilty of enterprise corruption "when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, [the person] . . . intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity" (Penal Law § 460.20 [1] [a]). For purposes of the OCCA, an "enterprise" may itself be legitimate, as the term includes the traditionally lawful entities referenced in the Penal Law § 175.00 (1) definition of enterprise (see Penal Law §§ 460.10 [2]; 175.00 [1] [defining enterprise as "any entity . . . corporate or otherwise, public or private, engaged in business, commercial, professional, industrial, eleemosynary, social, political or governmental activity"]). Or, it may fit within the OCCA definition of a "criminal enterprise": "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]).[FN5]
The legislature intended that its "carefully drawn definitions of the terms 'pattern of criminal activity' and 'criminal enterprise' . . . should be given their plain meaning, and should not be construed either liberally or strictly, but in the{**32 NY3d at 1154} context of the legislative purposes set forth" in the legislative findings (Penal Law § 460.00). The legislature emphasized that "the question whether to prosecute under [existing criminal statutes] or for the pattern itself is essentially one of fairness" (id.). That ultimate determination "will depend [*6]on the particular situation, and is best addressed by those institutions of government which have traditionally exercised that function: the grand jury, the public prosecutor, and an independent judiciary" (id.). Thus, the legislature intended for the courts, in their traditional role as final arbiters of the law, to ensure the application of the OCCA in any individual case is in accordance with the statutory language and the legislative intent.
II.
Defendant's Prosecution for Criminal Enterprise
The People charged defendant under the OCCA for participating in an alleged motorcycle theft ring in what the People labeled a "procurer" role, meaning a person who stole motorcycles for resale by other criminal actors. Defendant was jointly tried with, among others, Steve Dow, who the People maintained was a "distributor" of motorcycles stolen by defendant and other procurers in the criminal enterprise.[FN6] The People's theory was that, although the alleged criminal enterprise lacked a formal hierarchy, participants were governed by the organization's rules and practices and a system of designated roles.
According to the testimony at defendant's trial, procurers stole motorcycles, distributors found buyers and sometimes shipped the motorcycles to dealers in other countries, and dealers worked with the distributors in the domestic and international marketing of the motorcycles. The People presented proof that defendant had stolen and sold motorcycles on three separate occasions.[FN7] Each sale was conducted in a common manner.{**32 NY3d at 1155} Defendant sent text messages with photographs of the motorcycles he had stolen to a distributor, who in turn would contact a potential buyer or another distributor who knew of a potential buyer. The distributor would then arrange to meet with the buyer, or with the buyer and defendant, to execute the transaction. For each transaction, defendant set the price for the motorcycle and paid the distributor a $150 commission per motorcycle after the sale was completed.
The People elicited testimony regarding other participants in the alleged motorcycle theft ring to establish the existence of a criminal enterprise that operated with rules and coordination. For example, law enforcement officers testified that one of the distributors placed "orders" with a "crew" of procurers, asking them to steal certain models of motorcycles, and had, on one occasion, asked procurers (not defendant) to steal a specific motorcycle at the request of an undercover agent. Extensive wiretaps revealed that distributors typically brokered deals for procurers and that distributors would occasionally work together to hide or alter motorcycles. These telephone calls also established that one of the distributors reached a pricing agreement with a procurer who had started selling motorcycles to an undercover agent, so as to avoid [*7]undercutting each other. However, a cooperating witness for the People testified that "[t]here [was] no boss, everyone would work at your own free will but everyone had like their own part that they would play."
At the close of the evidence, defendant moved to dismiss for legal insufficiency, arguing that the People failed to establish a criminal enterprise with a hierarchy of authority or that defendant knew of or intentionally participated in the affairs of any enterprise. The trial court denied the motion, concluding that the OCCA does not require proof of a leadership structure and that the evidence was sufficient for a jury to determine whether defendant evinced knowledge of and an intent to further the enterprise. Defendant joined codefendant Dow's request for a charge that the jury must find a hierarchical structure to find them guilty. The court denied the request but instructed the jury that they could find an enterprise if they found a "hierarchy structure of authority that governed the relations of the members of the group, or that there was collective decision making as well as coordination of the group's activities."
The jury convicted defendant as charged of enterprise corruption, in violation of Penal Law § 460.20 (1) (a). The Appellate Division affirmed the conviction, rejecting defendant's{**32 NY3d at 1156} argument that the People failed to establish the existence of a criminal enterprise with an ascertainable structure within the meaning of the OCCA. The Court concluded "[t]here was a sufficiently ascertainable structure in which members of the enterprise played specific roles and worked collaboratively to effectuate the common purpose of the enterprise" (People v Jones, 149 AD3d 407, 408 [1st Dept 2017]). A Judge of this Court granted defendant leave to appeal (People v Jones, 29 NY3d 1128 [2017]).
III.
Insufficient Evidence of an Ascertainable Structure of a Criminal Enterprise
On appeal, defendant renews his argument that the evidence is insufficient to establish that he participated in a criminal enterprise with an "ascertainable structure" because there is no evidence of a hierarchy of leadership or a system of authority governing the affairs of the participants. He argues the evidence showed that participants acted on their own initiative, in arm's-length transactions, without direction from one another. The People concede that the theft ring did not have a formal hierarchy but argue that there is sufficient evidence of an ascertainable structure because the participants adhered to a set of rules and practices that governed how they conducted their criminal transactions. According to the People, by way of example, the evidence established that even though procurers set their own sale price, the system ensured everyone was paid a "fair" amount for their role in the enterprise, and the system minimized the participants' exposure because the motorcycles were quickly stolen, modified to avoid detection, and then sold. The People also assert there was evidence of "collective decision-making," referring essentially to market driven collaboration such as when distributors asked procurers to steal particular models of motorcycles.
The People's interpretation of the statutory term "ascertainable structure" ignores the text and purpose of the OCCA and would lead to an expansive application of the statute in contravention of the legislature's intent to cabin the OCCA to a narrow class of crimes. While the People argue that collective decision-making of all participants with majority rule could qualify as the enterprise's organizing principle for purposes of the OCCA, this position is belied by the legislative findings,{**32 NY3d at 1157} which make clear that the intended targets of the OCCA are criminal actors working within a system of authority where certain individuals hold positions of power superior to low-level actors. An ascertainable system then is one which is identifiable as distinct from the criminal transactions and is defined by an ascending command structure. As I discuss, the evidence here falls far short of establishing such a system.
A. Sufficiency of the Evidence Standard as Applied to Enterprise Corruption
"A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt' " (People v Danielson, 9 NY3d 342, 349 [2007], quoting [*8]People v Acosta, 80 NY2d 665, 672 [1993]). The Court must "marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (id.). Here, because the People's proof failed to establish the existence of an ascertainable structure within the meaning of the OCCA, the jury could not have found that there was a criminal enterprise and the proof was legally insufficient to support defendant's conviction for enterprise corruption.
The OCCA provides that a person is guilty of enterprise corruption "when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, [the person] . . . intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity" (Penal Law § 460.20 [1] [a]), consisting of at least three criminal acts (Penal Law § 460.10 [4]). The OCCA defines a criminal enterprise as "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]). To meet their burden, the People's evidence must establish (1) an identifiable organizational structure, (2) distinct from the underlying criminal pattern acts, (3) with its own defining purpose, and (4) exhibiting the capacity to continue in existence after the occurrence of any individual criminal transaction.
The Court has elucidated on the scope of the OCCA, providing guidance on what makes participation in three or more{**32 NY3d at 1158} crimes a criminal enterprise under the OCCA, exposing defendants to dramatically longer sentences than what would apply for the underlying pattern crimes. Those decisions, in various measures, are based on the analytic premise that the ascertainable structure is an identifiable system of authority, distinct from the pattern criminal acts.
In People v Besser, the Court explained
"[t]he emphasis of the [OCCA] was not on the quantity or nature of the myriad, isolated criminal activities underlying the new offense—conduct adequately addressed elsewhere in the Penal Law. Instead, it 'focuse[d] upon criminal enterprises because their sophistication and organization make them more effective at their criminal purposes and because their structure and insulation protect their leadership from detection and prosecution' (Penal Law § 460.00). Thus, the purpose of creating the separate crime was to address the particular and cumulative harm posed by persons who band together in complex criminal organizations" (96 NY2d 136, 142 [2001]).
Even where a defendant's commission of several pattern crimes is established, "[a] defendant may not be convicted of [enterprise corruption] unless the jury finds the acts were part of a pattern of criminal activity undertaken in furtherance of a cognizable criminal enterprise that extended beyond the common plan or scheme encompassing the alleged pattern acts" (id. at 143). That standard was easily met in Besser where the evidence connected the defendants to the activities of a crime family—the prototypical criminal enterprise—defined by a leadership hierarchy in service of traditional organized crime pursuits, which included loansharking, extortion, and larceny (id. at 144; see Penal Law § 460.00; Governor's Approval Mem, Bill Jacket, L 1986, ch 516 at 35 ["If, however, the group demonstrates a structure—such as the hierarchy of a 'Cosa Nostra' family, or the specialization of a narcotics, loansharking or gambling operation the criminal enterprise requirement is satisfied"]).
In People v Western Express Intl., Inc. (19 NY3d at 658-659), a case on all fours with defendant's appeal, the Court addressed directly whether an ascertainable structure exists where participants in an illegal market carry out criminal transactions through specific roles. Western Express involved the prosecution of alleged trafficking in stolen credit card information{**32 NY3d at 1159} facilitated by publicly available websites that served as meeting places for vendors and buyers of the stolen credit card data (19 NY3d at 659). The entity operating the websites was "not a neutral observer," as sites offered advice to vendors on how to structure transactions to best avoid detection, actively sought the business of vendors of stolen data, and provided an exchange service for the E-currency that was used in the transactions (19 NY3d at 655-656). The websites also collected a commission for their exchange services (id.). Nevertheless, the Court reasoned that the evidence failed to establish an ascertainable structure because the actors' specified [*9]roles—buyer, vendor, and facilitator—were not indicative of a "distinct, structured criminal enterprise," but were rather a description of how any illegal market for stolen credit card data is generally configured "given the needs and interests of the individual market participants" (id. at 659). The websites did "not permit the inference of an overarching criminal purpose or organization" because they were merely "publicly accessible loci for the conduct of business, the legality of which turned in the end upon the independent agendas of individual users" (id. at 660). The Court further reasoned
"[t]o the extent that the usage was for illegal purposes, it reflected the existence of a prevalent [illicit] market but did not reasonably justify the additional inference necessary to the viability of the proposed enterprise corruption prosecution, that there was within that market an enduring structurally distinct symbiotically related criminal entity with which [defendants] were purposefully associated" (id.).
In Western Express, the People argued, as they do here, that the requisite "ascertainable structure" of the criminal enterprise does not have to be hierarchical and may be inferred from patterns of criminal conduct (id. at 659). The Court acknowledged that while this may be a theoretical possibility, the OCCA requires the existence of an ascertainable structure distinct from the criminal pattern, and that "not surprisingly," no New York cases inferred the structure "simply from an underlying pattern" (id. at 659-660). Contrasting New York's law to RICO, the Court explained that RICO and the OCCA both require proof "of an association possessing a continuity of existence, criminal purpose, and structure—which is to say, of constancy and capacity exceeding the individual crimes committed{**32 NY3d at 1160} under the association's auspices or for its purposes" (id. at 658 [citation omitted]). However, the Court clarified that the OCCA "is assertedly of more narrow application" and "makes the requirement of 'an ascertainable structure distinct from a pattern of criminal activity' express in its definition of 'criminal enterprise' " (id.).
To illustrate, the Court compared the facts of Western Express with United States v Boyle, which involved a ring of bank thieves whose constant membership met occasionally to plan and execute the heists and share the proceeds from their criminal activity (id. at 660, citing Boyle, 556 US at 941). This established an enterprise for purposes of RICO. In contrast, the defendant in Western Express was implicated by "evidence of many arms' length transactions" that was insufficient to elevate an apparent illegal market to a criminal enterprise with "an enduring structurally distinct symbiotically related criminal entity with which appellants were purposefully associated" (id.). In other words, under the OCCA no criminal enterprise exists where participants in criminal activity merely enter an illicit market and do not act in accordance with the directives of a separate organizing structure. In such circumstances, defendants do not pose the same threat of a complex criminal association because they act in furtherance of their own economic interests and not the interests of a "structured, purposeful criminal organization" (id. at 659).
The requirement of a separate organizational command was reaffirmed in People v Kancharla (23 NY3d 294 [2014]), where, quoting Western Express, we stated that the OCCA does not cover "mere patterns of criminal conduct" but instead criminalizes "patterns of such conduct demonstrably designed to achieve the purposes and promote the interests of organized, structurally distinct criminal entities" (id. at 304, quoting Western Express, 19 NY3d at 658). In Kancharla, defendants were high-level officers in a corporation that tested construction materials (id. at 299-302). One of the defendants provided blank reports to allow employees to use a mathematical formula instead of actually conducting the tests, while the other defendant altered or directed others to alter the data used in the formula to ensure passing results (id.). We reversed the Appellate Division, which concluded in part that there was insufficient proof of a criminal enterprise. We held that the facts established a leadership structure because the participants engaged in their illicit activities within the corporate{**32 NY3d at 1161} structure "with the common purpose to promote its status as a major metropolitan materials testing laboratory and increase profits, despite the fact that the ill-gotten gains comprised only a small portion of the company's overall revenue" (id. at 305). We further observed that "[c]orporate officers and employees of a legitimate business organization can fall within the ambit of the enterprise corruption statutes" (id. at 304). Thus, although there was no direct evidence of communications, planning, or concerted activity, the pattern showed that defendants, as high-level corporate officers, were not only aware of the [*10]activities but "directed others to commit crimes in furtherance of the [criminal enterprise, namely, the legal business and its employees]" (id. at 305).
Then, in People v Keschner, we restated that the OCCA "specifically demands that the structure be distinct from the predicate illicit pattern" (25 NY3d 704, 719 [2015], quoting Western Express, 19 NY3d at 659). In that case, defendants were a doctor and chiropractor who ran a medical clinic with a third person who filed fraudulent insurance claims and operated a referral-kickback scheme (id. at 709-712). We were not called upon in that case to opine on the ascertainable structure element per se because the structure was obvious, as there were several persons with the shared purpose of committing a pattern of illicit activities associated with the lawful clinic business. Rather, we discussed the OCCA's separate continuity element and held that the enterprise survived removal of a key participant—in that case, a person who allegedly devised and entirely controlled the illegal actions of the clinic (id. at 719-721). As relevant here, we explained:
"[a] team of people who unite to carry out a single crime or a brief series of crimes may lack structure and criminal purpose beyond the criminal actions they carry out; such an ad hoc group is not a criminal enterprise. If a group persists, however, in the form of a 'structured, purposeful criminal organization,' beyond the time required to commit individual crimes, the continuity element of criminal enterprise is met" (id. at 720, quoting Western Express, 19 NY3d at 659).
Our reasoning in these four cases makes clear that, contrary to the People's assertion, a criminal enterprise must have a system of authority defined by an ascending command structure. In Besser, Kancharla, and Keschner, the defendants were{**32 NY3d at 1162} associated with organizations that had a hierarchy of authority—a command structure that ordered individuals to take on particular roles or carry out specific acts. In comparison, in the one case in which the Court held there was no ascertainable structure, Western Express, the Court explained that illegal market transactions alone cannot serve as the basis for finding a criminal enterprise because the actions of the participants are indistinct from the pattern criminal acts, as was evident by the fact that the buyers and vendors in that case were driven by their own interests and acted without direction.
The People struggle to identify a case where a criminal enterprise existed in the absence of an ascending command structure. This is because a structure cannot be distinct from a pattern of criminal acts without a system of authority. Otherwise, individuals are merely acting in an ad hoc fashion, in a manner necessary to carry out the pattern criminal acts. This is not to say that a criminal enterprise must have a single leader or that a collective of individuals who share some decision-making could never meet the requirements of the OCCA. Rather, what the legislature made clear and what we have held is required by the statute is that a criminal enterprise operate with a structure that is distinct from the agreed-upon criminal acts. Such a structure may only exist where the participants submit to a system of authority with an ascending command structure.
B. The People Fail to Establish Defendant's Guilt of Enterprise Corruption
This case is distinguishable from those cases with clearly ascertainable structures. This is not a case in which defendant was involved in the criminal activities of a crime family, as in Besser. Nor did the People's trial evidence establish defendant's involvement with an existing lawful business structure used for criminal activities, as in Kancharla and Keschner. Defendant's case instead reflects the type of criminal behavior that the Court held in Western Express lacks the characteristics of "a distinct, beneficially related criminal enterprise" (Western Express, 19 NY3d at 659), because the actors are nothing more than an ad hoc group whose shared purpose is to engage in the underlying criminal conduct (Keschner, 25 NY3d at 720).[FN8]
The People's evidence established only that defendant communicated and coordinated with distributors when he had{**32 NY3d at 1163} motorcycles to sell, which he had stolen on his own initiative. There is no evidence that had defendant stopped stealing motorcycles, the distributors would have found he had failed to satisfy an obligation, or that he would have faced a negative consequence, which would have been indicative of ascending authority. The evidence further established that procurers, like defendant, set their prices, distributors negotiated for lower prices, and distributors competed for buyers—evincing the self-interest of individual actors which belie the People's argument that they worked within an organized structure, distinct from the pattern criminal acts, and with its own common purpose. As the People's cooperating witness explained, "[t]here [was] no boss, everyone would work at your own free will but everyone had like their own part that they would play."
Even if the evidence established that defendant and the other participants had specific roles, the evidence failed to show that those roles were assigned or approved by a distinct criminal organizational entity whose structure existed independent of the criminal pattern. Moreover, what the People describe as designated or specialized roles reflect conduct inherent to a stolen property illicit market, which developed organically given the needs and interests of the individual market participants, including defendant. In other words, inherent in the criminal pattern activity was theft, modification of the property to avoid detection, and resale. Consider, for instance, the People's evidence that distributors placed "orders" with procurers. Apart from articulating the demands of the market, what did these orders amount to? They were not founded in a separate structure—e.g. an employer—employee, union officer—union member, or crime boss—underboss relationship—and there was evidence that procurers filled the orders only after negotiating a price.
Nor does evidence that defendant and the other participants coordinated their criminal activities to secure illicit profits transform their market transactions into an organizational structure with an existence independent of the acts themselves. Such evidence proves only that the participants here worked together, which is far from establishing their membership in an independent criminal entity. The People's argument extended to its logical conclusion would sweep within the OCCA's coverage all forms of criminal activity, expanding the{**32 NY3d at 1164} scope of enterprise corruption beyond its intended parameters and the narrow class of crimes targeted by the OCCA. As the legislative findings explain, and as this Court recognized in Besser, the OCCA "focuses upon criminal enterprises because their sophistication and organization make them more effective at their criminal purposes and because their structure and insulation protect their leadership from detection and prosecution" (Penal Law § 460.00). It did not transform crimes that properly fall within other Penal Law prohibitions into "organized crime."[FN9]
To achieve the OCCA's intended purpose to address that narrow category of organized crime, the People must present evidence of a hierarchy or some distinct system of authority with an ascending command leadership, insulated from prosecution, that directs enterprise participants and which survives the individual criminal transactions. In these organizations, the low-level actors bear the greatest risk of criminal penalty because they are visible participants in the crime and thus vulnerable to arrest and prosecution for their criminal acts while the higher-ups are less exposed. Here, by contrast, the People failed to establish an independent structure that survives beyond the pattern acts of motorcycle theft. The [*11]distributors, who the People allege coordinated the ring's activity, were present at the sale of the stolen motorcycles and were not insulated from criminal prosecution. This is not the equivalent of a hierarchical structure, and there is no organizational foundation.
In summary, several actors collaborating to further a criminal act is not a criminal enterprise. To justify the enhanced penalties attendant to conviction for enterprise corruption there must be proof of "patterns of criminal activity and their connection to ongoing enterprises, legitimate or illegal, that are controlled or operated by organized crime" (Penal Law § 460.00). That structure is lacking on the facts of this case.
IV.
Defendant's conviction for enterprise corruption should be reversed and the indictment dismissed because the People's theory of the case and trial evidence failed to establish the existence{**32 NY3d at 1165} of a criminal enterprise. A fortiori, the majority is correct that there is no evidence of the requisite mens rea, not because the evidence of intent is itself insufficient, but because defendant cannot have knowledge of a nonexistent criminal enterprise.[FN10]
Order reversed and indictment dismissed, in a memorandum. Chief Judge DiFiore and Judges Stein, Fahey, Garcia, Wilson and Feinman concur. Judge Rivera concurs in result in an opinion.

Footnotes

Footnote 1:While I agree with the majority that the People failed to establish sufficient evidence of defendant's criminal mens rea (majority mem at 
1148), I reach that conclusion for the more fundamental reason that defendant cannot have knowledge of a nonexistent criminal enterprise.

Footnote 2:In addition to imprisonment, the OCCA provided for forfeiture and trebled fines, and enacted CPLR 1353, which provided civil injunctive relief (Penal Law § 460.30 [1], [5]; CPLR 1353).

Footnote 3:The legislature also included two safeguards against prosecutorial abuse and overreach. First, the district attorney must file a statement to the court attesting to the appropriateness of an enterprise corruption charge (CPL 200.65). Second, a defendant may move to dismiss the count in the interest of justice "where prosecution of that count is inconsistent with the stated legislative findings in [Penal Law article 460]" (CPL 210.40 [2]).

Footnote 4:The context of the OCCA's passage—an era when "the state was grappling with an epidemic of organized crime"—lends further support for its narrow application to defendants who participate in complex criminal organizations akin to traditional syndicates (Noah A. Rosenblum, Comment, In Wakefield's Wake: Rescuing New York's Enterprise Corruption Jurisprudence, 126 Yale L J 525, 527, 530 [2016]).

Footnote 5:The OCCA's definition of a criminal enterprise is narrower than that of an enterprise under RICO. While the OCCA defines a criminal enterprise as a group of individuals "associated in an ascertainable structure" (Penal Law § 460.10 [3]), RICO broadly defines an enterprise as any legal entity or any group of individuals "associated in fact although not a legal entity" (18 USC § 1961 [4]; Boyle, 556 US at 944 ["the very concept of an association in fact is expansive"]). This difference is consistent with the legislature's intent, discussed above, to adopt more rigorous standards than RICO. Indeed, the OCCA's more stringent application is evidenced in the numerous differences between the two statutes. For instance, although both RICO and the OCCA require that a defendant participate in a pattern of criminal conduct associated with the enterprise, the OCCA sets a higher bar—RICO requires only two criminal acts while the OCCA requires participation in a minimum of three criminal acts, two of which are felonies other than conspiracy (18 USC § 1961 [5]; Penal Law § 460.20 [2] [a]). Similarly, while RICO encompasses a conspiracy to engage in racketeering activities, the New York Legislature has expressly provided that conspiracy to engage in enterprise corruption is not a criminal offense (18 USC § 1962 [d]; Penal Law § 105.35 ["conspiracy to commit the crime of enterprise corruption in violation of section 460.20 of this chapter shall not constitute an offense"]).

Footnote 6:Dow was ultimately convicted at trial of enterprise corruption and two counts of criminal possession of stolen property in the third degree (Penal Law § 165.50). He also pleaded guilty to a severed charge of criminal sale of a firearm in the first degree (Penal Law § 265.13 [1]). A third codefendant was convicted of grand larceny in the third and fourth degree (Penal Law §§ 155.35 [1]; 155.30) and criminal possession of stolen property in the fourth degree (Penal Law § 165.45). The fourth codefendant was acquitted of enterprise corruption.

Footnote 7:Defendant was alleged to have stolen four motorcycles, but one of the transactions, involving a single motorcycle, was struck as a pattern act. Evidence of that transaction was nevertheless admitted as evidence of an enterprise.

Footnote 8:The People charged a total of 27 codefendants. My analysis applies only to the facts as presented at defendant's trial and I do not reach any conclusions as to the conduct of the other codefendants or the sufficiency of the People's evidence as related to those individuals.

Footnote 9:The statement in Western Express that it "may be true in theory" that "a criminal enterprise need not be hierarchical to be structured" should not be given outsized significance (19 NY3d at 659). Whatever the intent of the majority's statement in that case, it does not stand for the proposition that the OCCA applies in a theoretical realm. To the contrary, Western Express highlights the absurdity of that suggestion in practice.

Footnote 10:Given my conclusion that there is insufficient evidence of an ascertainable structure, and as a consequence the People failed to establish the requisite mens rea, I have no occasion to opine on the merits of defendant's remaining claims.