[14 NE3d 354, 991 NYS2d 1]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent-Appellant,
v V. REDDY KANCHARLA, Appellant-Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent-Appellant,
v VINCENT BARONE, Appellant-Respondent.

Argued March 26, 2014; decided May 8, 2014

## POINTS OF COUNSEL

*Zuckerman Spaeder LLP*, New York City (*Paul Shechtman* and *Christina P. Skinner* of counsel), and *Harris Beach PLLC*, White Plains (*William A. Wetzel* of counsel), for appellant in the first above-entitled action. I. The spillover prejudice from the

enterprise corruption charge denied V. Reddy Kancharla a fair trial on the remaining counts. (*People v Morales*, 20 NY3d 240; *People v Colletti*, 73 AD3d 1203; *United States v Tellier*, 83 F3d 578; *People v Baghai-Kermani*, 84 NY2d 525; *United States v Rooney*, 37 F3d 847; *United States v Bruno*, 383 F3d 65; *United States v Pelullo*, 14 F3d 881; *United States v De Cavalcante*, 440 F2d 1264; *People v Castillo*, 47 NY2d 270; *United States v Guiliano*, 644 F2d 85.) II. There was insufficient evidence that V. Reddy Kancharla participated in a scheme to defraud relating to steel inspections. (*People v Rayam*, 94 NY2d 557.) III. The court erred in excluding evidence supporting V. Reddy Kancharla's defense on the mix-design counts. (*People v Kisina*, 14 NY3d 153; *United States v Seelig*, 622 F2d 207; *United States v Christo*, 614 F2d 486; *United States v Riley*, 550 F2d 233; *People v Gilman*, 28 Misc 3d 1217[A], 2010 NY Slip Op 51379[U].)

*Lankler Carragher & Horwitz LLP*, New York City (*Andrew M. Lankler* and *Joseph C. Perry* of counsel), for appellant in the second above-entitled action. I. The prejudicial spillover effect of the tainted enterprise corruption count deprived Vincent Barone of a fair trial because there can be no doubt that the jury's decision to convict on the tainted count unduly influenced its guilty verdict on the remaining counts. (*People v Baghai-Kermani*, 84 NY2d 525; *People v Morales*, 20 NY3d 240; *People v Concepcion*, 17 NY3d 192; *People v Doshi*, 93 NY2d 499; *United States v Tellier*, 83 F3d 578; *United States v DiNome*, 954 F2d 839; *People v Colletti*, 73 AD3d 1203.) II. The risk of spillover prejudice was exacerbated by the trial court's erroneous comments and rulings. (*People v Ciaccio*, 47 NY2d 431; *People v Carter*, 40 NY2d 933; *People v Malloy*, 55 NY2d 296; *People v O'Rama*, 78 NY2d 270; *People v Arnold*, 98 NY2d 63; *People v Yut Wai Tom*, 53 NY2d 44; *People v Moulton*, 43 NY2d 944; *People v De Jesus*, 42 NY2d 519; *People v Tucker*, 89 AD2d 153.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Amyjane Rettew, Daniel R. Alonso, Hilary Hassler* and *Gina Mignola* of counsel), for respondent in the first and second above-entitled actions. I. Contrary to the views expressed in Justice Catterson's majority opinion, the evidence was legally sufficient to establish that Vincent Barone and V. Reddy Kancharla were guilty of enterprise corruption. (*People v Hampton*, 21 NY3d 277; *People v Calabria*, 3 NY3d 80; *People v Giles*, 73 NY2d 666; *People v Mackell*, 40 NY2d 59; *People v D'Alessandro*, 13 NY3d 216; *People v Albro*, 52 NY2d 619; *People v Washington*, 71 NY2d 916; *People v Khan*, 18 NY3d 535; *People v Western Express*

*Intl., Inc.*, 19 NY3d 652; *People v McFadden*, 106 AD3d 1020.) II. The Appellate Division correctly concluded that the underlying counts against the defendants should be affirmed. (*People v Doshi*, 93 NY2d 499; *People v Baghai-Kermani*, 84 NY2d 525; *People v Morales*, 20 NY3d 240; *People v Concepcion*, 17 NY3d 192; *People v Sinha*, 19 NY3d 932; *People v Daly*, 14 NY3d 848; *United States v Bruno*, 383 F3d 65; *United States v Rooney*, 37 F3d 847; *United States v Jones*, 482 F3d 60; *United States v Hamilton*, 334 F3d 170.) III. The evidentiary rulings connected to the mix-design counts were proper. (*People v Goodman*, 31 NY2d 262; *People v Kisina*, 14 NY3d 153; *Smith v United States*, 188 F2d 969; *United States v Brookshire*, 514 F2d 786; *Burnett v United States*, 222 F2d 426; *Newton v Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F3d 266; *United States v Seelig*, 622 F2d 207; *United States v Riley*, 550 F2d 233; *United States v Christo*, 614 F2d 486; *People v Gilman*, 28 Misc 3d 1217[A], 2010 NY Slip Op 51379[U].) IV. There was overwhelming evidence that Vincent Barone tampered with Testwell Laboratories, Inc.'s test data. V. The evidence amply proved that the defendants each intentionally aided in the steel inspection scheme. (*People v Alfaro*, 66 NY2d 985; *People v Satloff*, 56 NY2d 745; *People v Stahl*, 53 NY2d 1048; *People v Tucker*, 55 NY2d 1; *People v Rayam*, 94 NY2d 557; *Dunn v United States*, 284 US 390; *People v Horne*, 97 NY2d 404.) VI. The three judicial comments Vincent Barone attacks could not have influenced the jury's verdict. (*People v Killgo*, 33 AD2d 226; *People v Charleston*, 56 NY2d 886; *People v Moulton*, 43 NY2d 944; *People v Yut Wai Tom*, 53 NY2d 44.) VII. The court provided a meaningful response to the jury's note about the crime of false filing. (*People v O'Rama*, 78 NY2d 270; *People v Weinberg*, 83 NY2d 262; *People v Steinberg*, 79 NY2d 673; *People v Malloy*, 55 NY2d 296; *People v Santi*, 3 NY3d 234; *People v Almodovar*, 62 NY2d 126; *People v Torres*, 8 AD3d 123; *People v Washington*, 35 AD3d 288; *People v Overlee*, 236 AD2d 133; *People v Lugo*, 81 AD3d 532.)

**OPINION OF THE COURT**

Graffeo, J.

We are asked in these appeals whether the Appellate Division applied the correct legal standard when it reviewed the sufficiency and weight of the evidence supporting defendants' convictions for enterprise corruption (Penal Law art 460). We hold that the Appellate Division did not properly consider the elements of the crime under *People v Western Express Intl., Inc.* (19 NY3d 652 [2012]), that the trial evidence sufficiently

established defendants' commission of enterprise corruption and that the Appellate Division should reassess its weight of the evidence determination under the applicable statutory standards.

## I

Construction contractors in New York City often hire licensed testing firms to ascertain proper compliance with building code provisions due to the stringent nature of those regulations (see Administrative Code of City of NY § 28-701.1 et seq.) and the limited resources of the City's Department of Buildings. One such compliance firm was Testwell Laboratories, Inc., a leading materials testing company operating in the metropolitan area. Defendant V. Reddy Kancharla, a professional engineer, served as Testwell Laboratories' president and chief executive officer. Defendant Vincent Barone was a company vice-president in charge of the corporation's engineering department.

A grand jury charged defendants and others with engaging in a pattern of criminal activity while intentionally conducting and participating in the affairs of a criminal enterprise—referred to as the "Testwell Group"—consisting of Testwell Laboratories, Inc., and a number of its officers and employees. The indictment alleged that defendants committed or allowed certain of the corporation's employees to engage in a multitude of illegal acts involving the falsification of test results, improper inspections of construction projects and double-billing of clients. Those offenses were grouped under distinct, but interrelated, criminal schemes related to five categories of Testwell Laboratories' material testing services: (1) "Mix-Design"; (2) "Steel Inspections"; (3) "Certified Inspectors"; (4) "Field Tests"; and (5) "Compressive/Flexural Strength Alterations."

The essence of the "mix-design" scheme was that Testwell Laboratories would be retained by contractors or project owners to test and determine the strength of proposed concrete mixtures used at various construction sites. Instead of engaging in appropriate laboratory testing of the concrete samples, it was alleged that Testwell Laboratories merely used a mathematical formula to replace actual analysis and then issued reports falsely certifying that the results were based on legitimate test results. Those reports bore Kancharla's signature and engineer's stamp, and their falsity became obvious since Testwell Laboratories charged far less ($300 or $500) for those reports than it ordinarily billed when concrete was analyzed with laboratory

testing (approximately $4,000). Furthermore, different reports, created months apart, displayed improbably similar results with distinct patterns, and some reports were generated within days of being ordered despite the fact that the building code mandated longer intervals between sequential tests. Testwell Laboratories also designed a computer program that automatically generated figures for concrete strength after a desired final result was specified. In the course of the criminal investigation—in which Testwell Laboratories' laboratory director cooperated with the People—scores of blank mix-design reports were discovered that were pre-signed by Kancharla and bore his seal. Kancharla acknowledged wrongdoing, but claimed that he committed regulatory violations of the building code rather than criminal offenses.

The "steel inspections" plot was premised on evidence that Testwell Laboratories failed to properly conduct steel inspections according to the code since it assigned two agents to multiple construction projects that they could not possibly have inspected on a full-time basis without additional assistance. Investigators found that neither inspector was in attendance at a steel fabrication facility and mandatory inspection records were not maintained.

The charges pertaining to "certified inspectors" arose from a school construction project in Queens. Testwell Laboratories falsely certified that two of its employees had proper professional certifications to test concrete as it was being poured. The related "field tests" category involved false confirmations that Testwell Laboratories had performed various concrete tests at two construction sites.

Finally, the adequacy of laboratory testing of concrete was the focus of the "compressive/flexural strength alterations" allegations. The building code mandates that concrete being poured must be collected and formed into cylinders (for compressive testing) or beams (for flexural testing), which are then brought to a laboratory for scientific analysis of actual strength. A Testwell Laboratories computer system was programmed to permit certain employees to engage in the alteration of testing data. The program hid the employees' identities and issued warnings if inputted data did not generate an acceptable concrete strength. Company staff notified Barone or another Testwell Laboratories' supervisor when such alerts were received and Barone would instruct data entry personnel to change the computations. Investigators discovered facsimile

messages from Barone that listed hundreds of numerical changes and a technician who participated in the fraud cooperated with the prosecution. In total, investigators determined that data had been altered several thousand times on more than 100 different construction projects.

In connection with these alleged illegal activities, Kancharla and Barone were tried jointly before a jury on 50 counts that included a charge that they were members of the Testwell Group "criminal enterprise" under article 460 of the Penal Law. In support of that offense, Kancharla was charged with committing various criminal "pattern acts" while participating in the schemes involving mix design, steel inspections and certified inspectors; Barone was charged with multiple offenses for his alleged involvement in the schemes for steel inspections, compressive/flexural strength alterations, and certified inspectors.[1] Kancharla was ultimately found guilty of enterprise corruption, all 13 mix-design counts and one steel inspections count.[2] Barone was likewise convicted of enterprise corruption, along with five crimes under the compressive/flexural strength alterations scheme; seven offenses for the steel inspections scheme; and the certified inspectors scheme as a pattern act for enterprise corruption.[3] Kancharla was sentenced to an aggregate prison term of 7 to 21 years and Barone received a 5⅓-to-16-year aggregate sentence.

The Appellate Division modified by vacating the enterprise corruption convictions and reducing the sentences for both defendants in the interest of justice to 1⅓ to 4 years (101 AD3d 585 [1st Dept 2012]).[4] It concluded that the enterprise corruption convictions lacked sufficient proof and were against the weight of the evidence because "the People failed to produce any evidence that either defendant knew that test results and

---

1. The certified inspectors scheme was charged as a "pattern act" for enterprise corruption because it occurred in Queens County and the New York County grand jury therefore lacked geographical jurisdiction to indict defendants on specific crimes pertaining to that scheme.

2. Specifically, Kancharla was convicted of enterprise corruption, two counts of scheme to defraud in the first degree, nine counts of offering a false instrument for filing in the first degree and three counts of falsifying business records in the first degree.

3. The jury found that Barone committed enterprise corruption, attempted grand larceny in the third degree, two counts of scheme to defraud in the first degree and nine counts of offering a false instrument for filing in the first degree.

4. The court also vacated two counts of offering a false instrument for filing against Kancharla. The propriety of that ruling is not at issue on appeal.

inspection reports were fabricated, much less that the defendants spearheaded a criminal enterprise" (*id.* at 587). The court also found that the prosecution did not establish "a leadership structure, overall planning of the criminal enterprise, or any communications . . . in furtherance of the criminal enterprise" (*id.* at 592). The Appellate Division rejected defendants' challenges to the non-enterprise corruption offenses. One Justice dissented and would have affirmed the enterprise corruption convictions; another Justice dissented and would have ordered a new trial on all of the remaining non-enterprise corruption counts. Both parties were granted leave to appeal to our Court.

## II

Our primary concern in this appeal focuses on the enterprise corruption convictions. The People argue that the Appellate Division did not apply the proper legal standard for criminal enterprises in reviewing the sufficiency and weight of the evidence supporting the jury's verdict. More particularly, the People assert that the Appellate Division vacated the convictions based on a misunderstanding of Penal Law article 460 and *People v Western Express Intl., Inc.* (19 NY3d 652 [2012]). Defendants, in contrast, ask us to dismiss the cross appeal on jurisdictional grounds because they believe that the Appellate Division examined the correct legal rules and decided only questions of fact.

Sufficiency and weight review are distinct concepts. To determine whether a verdict was based on sufficient proof, a court must "marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained [their] burden of proof" (*People v Danielson*, 9 NY3d 342, 349 [2007]). Evidence of guilt is legally sufficient if the facts, viewed in the light most favorable to the People, provide a valid line of reasoning and permissible inferences from which the finder of fact could have rationally concluded that the elements of the crime were established beyond a reasonable doubt (*see e.g. id.*; *People v Heidgen*, 22 NY3d 259, 277 [2013]; *People v Delamota*, 18 NY3d 107, 113 [2011]).

A legally sufficient verdict, however, may be against the weight of the evidence (*see People v Danielson*, 9 NY3d at 349). Unlike a sufficiency analysis, weight of the evidence review requires an intermediate appellate court to act, in effect, as a second jury (*see People v Romero*, 7 NY3d 633, 644 n 2 [2006])

by rendering its own determination of the facts as proved at trial "in light of the elements of the crime as charged to the other jurors, even when the law has changed between the time of trial and the time of appeal" (*People v Danielson*, 9 NY3d at 349). In according "[g]reat deference . . . to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (*People v Bleakley*, 69 NY2d 490, 495 [1987]), the reviewing court must

> "first . . . determine whether an acquittal would not have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the jury was justified in finding the defendant guilty beyond a reasonable doubt" (*People v Danielson*, 9 NY3d at 348, citing *People v Crum*, 272 NY 348 [1936]; *see e.g. People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]).

This standard generally requires factual assessments that are within the exclusive province of the intermediate appellate courts (*see* CPL 470.15 [5]; *see e.g. People v Rayam*, 94 NY2d 557, 560 [2000]). Consequently, we cannot review a weight of the evidence challenge unless the intermediate appellate court manifestly failed to consider the issue or did so using an incorrect legal principle (*see e.g. People v Romero*, 7 NY3d at 646). Where the court below erred as a matter of law, the remedy is to reverse and remit for a proper assessment of the weight of the evidence (*see People v Danielson*, 9 NY3d at 349-350; *People v Romero*, 7 NY3d at 646).

### III

Our evaluation of the sufficiency of the enterprise corruption convictions begins with the relevant Penal Law provisions. The "Organized Crime Control Act" (Penal Law art 460) was created in 1986 (*see* L 1986, ch 516) "to address the particular and cumulative harm posed by persons who band together in complex criminal organizations" (*People v Besser*, 96 NY2d 136, 142 [2001]). It outlawed participation in a "criminal enterprise," defined as "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a

continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]).

We addressed the concept of enterprise corruption in *People v Western Express Intl., Inc.* (19 NY3d 652 [2012]). In that case, the corporation was controlled by a defendant who maintained a website providing a medium for other defendants to independently purchase or sell stolen credit card information. Based on the text of the enterprise corruption statutes, we observed that it is "necessary to distinguish between . . . mere[ ] patterns of criminal conduct and . . . patterns of such conduct demonstrably designed to achieve the purposes and promote the interests of organized, structurally distinct criminal entities" (*id.* at 658). Only the second situation is encompassed within Penal Law article 460 because the crime of enterprise corruption "demand[s] proof of an association possessing a continuity of existence, criminal purpose, and structure—which is to say, of constancy and capacity exceeding the individual crimes committed under the association's auspices or for its purposes" (*id.*). We found the proof of guilt to be insufficient in *Western Express* because there was no "structured, purposeful criminal organization" or "inference of a distinct, beneficially related criminal enterprise" (*id.* at 659).

In this case, the Appellate Division did not apply the proper legal standards when it reviewed the sufficiency of defendants' enterprise corruption convictions. It concluded that "the People failed to introduce any evidence of a leadership structure, overall planning of the criminal enterprise, or any communications between Kancharla, Barone, and any of the Testwell employees in furtherance of the criminal enterprise" (101 AD3d at 592). Those determinations were erroneous as a matter of law.

Testwell Laboratories itself was a corporate entity that had a distinct hierarchical apparatus with Kancharla positioned as its leader and manager. Corporate officers and employees of a legitimate business organization can fall within the ambit of the enterprise corruption statutes (*see* Penal Law § 460.20 [3]; Governor's Mem approving L 1986, ch 516, 1986 McKinney's Session Laws of NY at 3177 [Penal Law article 460 was designed to encompass "a criminal group existing and operating within (a) legitimate enterprise"]). Here, the People demonstrated adequately that the Testwell Group had a "continuity of existence, criminal purpose and structure . . . exceeding the

individual crimes committed under the association's auspices or for its purposes" (*People v Western Express Intl., Inc.*, 19 NY3d at 658). The offenses were perpetrated in conjunction with five interrelated illegal schemes that covered hundreds of construction projects. And the operations of the corporation established the necessary continuity beyond the individual criminal offenses. In this regard, *Western Express* is clearly distinguishable from the facts presented here because the persons involved in that scheme were ad hoc operators who used the defendant corporation's website as a medium to independently traffic in stolen credit card information with "no hint that any of the market participants acted except for and according to their own particular interests" (*id.* at 659). In contrast, the members of the Testwell Group can reasonably be viewed as engaging in their illicit and fraudulent activities within Testwell Laboratories' existing corporate structure with the common purpose to promote its status as a major metropolitan materials testing laboratory and increase profits, despite the fact that the ill-gotten gains comprised only a small portion of the company's overall revenue.

The Appellate Division further observed that there was no direct evidence of communications, planning or concerted activity between the Testwell Group actors. Direct proof of this nature, however, is not essential to a legally sufficient case of enterprise corruption. To the contrary, the overall pattern of criminal activity and the involvement of various individuals at all levels of Testwell Laboratories' corporate structure allowed the jury to infer that Kancharla and Barone, as high-level corporate officers, were aware of, participated in and directed others to commit crimes in furtherance of the Testwell Group's objectives. Indeed, Kancharla admitted that he personally provided blank mix-design reports bearing his signature and engineer's stamp so that concrete strength could be fraudulently certified by another company employee using a mathematical formula instead of performing actual tests in the laboratory. Barone, in turn, attempted to conceal those falsehoods with additional fraud—altering testing results so it would appear consistent with acceptable, expected results. When Barone did not do so personally, he directed others to falsify the data, and company employees used a computer program designed to hide the identity of the individuals inputting the fake data and warn them if true information had already been conveyed to clients of Testwell Laboratories. Nor did defendants have to be privy to

every crime or scheme committed by the Testwell Group—it was enough that they were aware of the general structure of the enterprise, had knowledge of the overarching criminal design, and engaged in a requisite pattern of criminal activity (*see e.g.* Penal Law § 460.10 [3], [4]).

In sum, there was a valid line of reasoning and permissible inferences (*see e.g. People v Heidgen*, 22 NY3d at 277; *People v Delamota*, 18 NY3d at 113) from which the jury could have rationally concluded that defendants operated the Testwell Group and participated in its illegal activities in a manner that satisfies the definition of a "criminal enterprise." The People's evidence was therefore legally sufficient to support the enterprise corruption convictions.

## IV

The Appellate Division alternatively concluded that, based on its review of the "law and the facts," the findings of guilt were against the weight of the evidence. Looking beyond that assertion (*see People v D'Alessandro*, 13 NY3d 216, 218-219 [2009]; *People v Giles*, 73 NY2d 666, 670 [1989]), however, it is evident that the court's weight of the evidence analysis was infected by the same error of law that led it to vacate the enterprise corruption convictions on sufficiency grounds.[5] The Appellate Division should therefore reconsider its determination under the appropriate legal standards (*see* Penal Law § 460.00 *et seq.; People v Western Express Intl., Inc.*, 19 NY3d 652 [2012]). In light of our conclusion, it is unnecessary to address defendants' remaining contentions at this juncture.

Accordingly, the order of the Appellate Division should be modified by remitting the cases to that court for further proceedings in accordance with this opinion and, as so modified, affirmed.

Chief Judge LIPPMAN and Judges READ, SMITH, PIGOTT and RIVERA concur; Judge ABDUS-SALAAM taking no part.

In each case: Order modified by remitting to the Appellate Division, First Department, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

---

**5.** For this reason, the People's appeal satisfies the requisites of CPL 450.90 (2) (a).