People v Clavell (2019 NY Slip Op 07271)





People v Clavell


2019 NY Slip Op 07271


Decided on October 9, 2019


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 9, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

LEONARD B. AUSTIN, J.P.
JEFFREY A. COHEN
VALERIE BRATHWAITE NELSON
ANGELA G. IANNACCI, JJ.


2013-07762
 (Ind. No. 111/11)

[*1]The People of the State of New York, respondent, 
v
Christopher Clavell, also known as "Noel," appellant.


Mischel & Horn P.C., New York, NY (Richard E. Mischel and Gail Jacobs of counsel), for appellant.
John M. Ryan, Acting District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, and Jonathan K. Yi of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Joseph A. Zayas, J.), rendered June 27, 2013, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for further proceedings consistent with CPL 160.50.
At approximately 6:40 a.m. on August 11, 2000, Barbara Perez was found dead on the floor in the back of Power Factory, a gym where she worked in Queens. She had sustained eight gunshot wounds to the head and one to the chest. Perez's duties included opening the gym each morning at 6:00 a.m., turning on the lights and music, and opening the windows and the doors to the fire escape. At the time that Perez's body was found, her purse was on the front reception counter, the lights were off, no music was playing, and her keys were in the door to the fire escape, near her body, suggesting that the murder had occurred while she was opening the gym for the day. Power Factory was located on the fourth floor of a four-story commercial building.
The defendant and Perez had dated in the past and had a son together, who was approximately 2½ years old in the summer of 2000. At approximately 11:45 a.m. on the day of the murder, the defendant voluntarily accompanied detectives to a police station. The police searched a backpack the defendant had with him, his car, and his home, but no forensic evidence connecting the defendant to the murder was recovered. The police also went to a Bally's Total Fitness gym where the defendant had exercised that morning and searched the locker room, cutting all locks off of the lockers that did not belong to employees or regular club members in an effort to acquire evidence, but none was recovered. In addition, at approximately 2:00 p.m. on the day of the murder, police canines searched for the defendant's scent in the gym where Perez's body was found, but they did not find any such evidence.
At the scene of the crime, the police recovered nine discharged shell casings, a broken fingernail, and hair fibers from Perez's shirt and pants. These items were forensically tested, and [*2]no connection was found to the defendant. The shell casings were later determined to be .22 caliber cartridge casings, fired from the same semiautomatic pistol, but no firearm was recovered. Police officers searched for fingerprints at the scene of the crime, and recovered three latent fingerprints that were thought to be of value. The fingerprints did not belong to the defendant or Perez, and they remained unidentified at the time of trial.
For reasons unexplained on this record, the prosecution waited nearly 11 years before charging the defendant with a crime relating to the murder. In April 2011, the defendant was indicted for murder in the second degree. At trial, the prosecution's evidence was entirely circumstantial, and no new evidence appears to have developed in the 11 intervening years between the occurrence of the crime and indictment. The People's theory of the case was that the defendant was motivated to kill Perez because he was angry about his child support obligation for their son, and he had the opportunity to kill her on the morning of the crime.
In support of this theory, the People presented the following, primarily testimonial, evidence. When Perez became pregnant with the defendant's child in the summer of 1997, the defendant, who already had two children with other women, made it clear to Perez that he did not want a third child and he attempted to persuade her to have an abortion. The defendant complained that he did not want to be burdened with additional child support, and he told one person that he would see Perez dead before she would get a dime from him.
Early in Perez's pregnancy, she moved in with her sister-in-law, Donna Ramos. Ramos testified that, once, while Perez was pregnant, she observed marks on Perez's neck, as if someone had strangled her. Ramos believed that the marks were caused by the defendant. After the child was born, Ramos would watch the child when Perez was at work. Perez would occasionally bring the child to the defendant's home, where she would babysit for the defendant's older son while the defendant was at work.
The defendant, who worked as a corrections officer until the time of his arrest, had also previously worked part time teaching self-defense classes at the Power Factory gym. He helped Perez get a job as a cleaner at Power Factory, and Perez soon was promoted to running the front desk. The owner of Power Factory testified that he noticed tension between the defendant and Perez, and he had received complaints about the defendant's performance from others, so he terminated the defendant's employment at Power Factory. Others at the gym also noticed strife between Perez and the defendant several months prior to the murder.
Approximately one year prior to Perez's murder, Tricia Dietz dated the defendant for four months. Dietz testified at trial that during this time she heard the defendant argue with Perez on the telephone, and the defendant told Dietz, "I would like to kill this girl some day." Dietz did not think that the defendant meant it. At the time of Perez's murder, Dietz, who was no longer dating the defendant, was interviewed by the police and she did not tell the police about this statement. Yet, at trial, she purportedly recalled that the defendant had made this statement more than 13 years prior.
Perez did not initiate child support proceedings against the defendant. However, since Perez was on public assistance, the commissioner of social services commenced a child support proceeding against the defendant. The defendant voluntarily paid child support in the amount of $600 per month for his older son, and he had never complained to that child's mother of the obligation. In addition, the defendant was ordered to pay the commissioner of social services $238 biweekly for the support of his daughter in a July 12, 2000, order. In a separate order issued in July 2000, the defendant was directed to pay Perez $63 per week in child support for their son. He complained to numerous people about the support proceeding against him concerning his son with Perez.
On July 31, 2000, the defendant voluntarily surrendered his .38 caliber service firearm to the New York City Department of Correction. An acquaintance of the defendant, Anthony Velez, who had convictions for armed robbery and criminal possession of a weapon, testified at trial [*3]that in the weeks or months prior to August 11, 2000, the defendant came to him and said that he wanted to purchase two guns that were 9 millimeter or .45 caliber. According to Velez, the defendant said that he did not want anything smaller than a .38 caliber, as he wanted something that would do more damage than a .25 or a .22 caliber. The defendant explained that he had "a beef to sweat, a problem." Velez understood this to mean that the defendant had a problem "out on the street that he needed to take care of." Velez testified that the defendant told him that he had financial problems, including child support, and there was something that he needed to do as quickly as possible. Velez further testified that the defendant said that some inmates had advised him to wear latex gloves and to change and burn his clothing afterwards so as to dispose of any gun powder residue. Velez told the defendant that everyone he knew who had been involved "in stuff like that was either locked up or dead," suggesting that he would not be able to find him guns. According to Velez, the defendant called him a couple of times to follow up, and, in the week before Perez's murder, the defendant told him that he had purchased a ".38 revolver and a .22 with a built-in suppressor."
The defendant lived near the Power Factory gym. Perez had taken their son to the gym on prior occasions. At trial, Ramos testified that the night before the murder, Perez told her that she wanted to take her son with her to the gym the following morning because the defendant wanted to see their son that morning. Ramos argued with Perez, and ultimately it was decided that the child would not go to the gym the following morning. Elsie Hernandez testified that the day before the murder, she saw Perez on a bus and Perez reported that she was running late to work. As Perez was exiting the bus, she sucked her teeth and said, "there goes my ex . . . there goes my day." Hernandez looked out the window and saw the defendant, who looked impatient, as if he had been waiting. Hernandez testified that Perez was talking loudly to the defendant and the defendant grabbed Perez's arm.
The defendant regularly parked his car in a parking lot that was approximately one block away from the Power Factory gym and near his home. On the morning that Perez was murdered, the defendant drove into the lot between 6:30 and 7:00 a.m., and parked his car. He approached the parking attendant to talk, as usual. The attendant testified that they had the same type of conversion as they had had the day before. The defendant was always angry and "there was always something going on with his life: With his girlfriend, with his kid and child support, and stuff like that." The day before, the defendant told the attendant that he felt like he had to sell drugs because of the child support he had to pay. The defendant had a regular schedule, but on that day, as well as the days immediately prior, he came to the parking lot a little earlier than usual. After speaking to the attendant on the morning in question, the defendant said that he was going to go home to shower and change, and he walked away. The defendant did not seem particularly agitated, and the parking lot attendant did not see any blood splatter or sweat on the defendant.
The defendant was a daily customer of a delicatessen that was near the parking lot and the Power Factory gym. He would order the same breakfast each morning, usually between 8:00 and 8:05 a.m. At trial, the owner of the deli testified that on the morning that Perez was murdered, the defendant came in a little earlier than usual and he seemed like he did not want to talk. He looked "distracted," "extremely pale," and he had a "fresh wound" on his left temple, that "could have been a pimple that he tried to squeeze" or it "could have been he hit his head somewhere." While the defendant's breakfast was being prepared, an ambulance and a police car appeared in front of the building that Power Factory was located in, which was visible from the deli windows. The deli owner testified that he had a brief conversation with the defendant about the emergency vehicles, and the defendant told him that he would call Perez later to find out what had happened. The defendant took his breakfast and walked in the direction of the parking lot.
The parking lot attendant testified that the defendant returned to his car between 7:30 and 8:30 a.m., and that he was wearing different clothing than he had been earlier that morning and he appeared to have cleaned himself up. The defendant appeared at Bally's Total Fitness at approximately 10:00 a.m. As indicated above, the defendant met with police at 11:45 a.m., and upon searches of his belongings, automobile, and residence, no evidence was found connecting him to the shooting.
Following Perez's murder, the defendant petitioned for custody of their son, but custody was awarded to Perez's mother, who had custody of Perez's older child as well. The defendant initially visited his son regularly, but the visits became sporadic after some time. Nearly 11 years after the murder, on April 18, 2011, the police arrested the defendant for his alleged involvement in this crime. As noted, the defendant had continued to work as a corrections officer until the time of his arrest. While he was being fingerprinted, he told the police officer, "this is a coincidence. I was just talking to the guy who killed his girl down in Manhattan." The officer believed that the comment was in reference to a high-profile case that was then being tried in a Manhattan court.
The jury found the defendant guilty of murder in the second degree. The defendant appeals, arguing, among other things, that the verdict of guilt was against the weight of the credible evidence. We reverse on the ground that the jury's verdict was against the weight of the evidence.
"[W]eight of the evidence review requires a court first to determine whether an acquittal would not have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the jury was justified in finding the defendant guilty beyond a reasonable doubt" (People v Danielson, 9 NY3d 342, 348; see People v Romero, 7 NY3d 633, 643; People v Bleakley 69 NY2d 490, 495). The court "act[s], in effect, as a second jury by rendering its own determination of the facts as proved at trial" (People v Kancharla, 23 NY3d 294, 302-303 [citation omitted]; see People v Delamota, 18 NY3d 107, 116-117; People v Romero, 7 NY3d at 644 n 2).
Upon the exercise of our factual review power (see CPL 470.15[5]), we determine that an acquittal would not have been unreasonable. Further, giving the evidence the weight it should be accorded, we find that the People failed to establish, beyond a reasonable doubt, that the defendant was the person who murdered Perez. There was no direct evidence of the defendant's guilt. Nor did any of the forensic evidence link the defendant to the crime. None of the fingerprints or hair fibers that were recovered belonged to the defendant, and his DNA was not found on the broken fingernail. Police canines did not detect his scent at the scene of the crime. Within hours of the murder, the police searched the defendant, his automobile, his home, and the gym where he had exercised that morning, and no evidence related to the murder was found. The People's case rested on the inferences to be drawn from the circumstantial evidence presented.
Where the prosecution relies entirely on circumstantial evidence, before the fact-finder can draw an inference of guilt, that inference must be the only one that can fairly and reasonably be drawn from the proven facts, and the evidence must exclude beyond a reasonable doubt every reasonable hypothesis of innocence (see People v Marin, 65 NY2d 741, 742; People v Benzinger, 36 NY2d 29, 32; see also People v Reed, 22 NY3d 530, 534). The inferences to be drawn from the People's evidence in this case as to coincidence of time, place, and behavior are sufficient only to create suspicion. The evidence presented at trial is not inconsistent with the defendant's innocence, and any determination of guilt requires too much speculation to fill the gaps in the People's evidence to constitute proof beyond a reasonable doubt.
The trial evidence established that the defendant and Perez had a contentious relationship and the defendant was stressed about and complained of his child support obligations. It is unclear why the $63 weekly child support obligation would drive the defendant to murder when his other, greater, child support obligations—a $600 monthly obligation and a $238 biweekly obligation—did not.
The evidence also established that the defendant was near the Power Factory gym on the morning of the murder. However, he was near the gym every morning since he lived nearby, parked nearby, and had his breakfast at the same deli, which faced the gym, every morning. The circumstantial evidence established that Perez was murdered sometime between approximately 6:00 a.m. and 6:40 a.m. The defendant was seen driving into a nearby parking lot between 6:30 and 7:00 a.m. This evidence affords the possibility that the defendant killed Perez, quickly rid himself of the [*4]gun and any other evidence that would connect him to the shooting, and then drove his car into the parking lot one block away from the murder scene. Yet, his exchange with the parking lot attendant was described as typical, and the defendant did not appear agitated. Although the defendant arrived at the parking lot a little earlier than usual, he had arrived earlier on the days immediately prior as well. Likewise, the deli owner who saw the defendant shortly thereafter thought that the defendant appeared distracted and extremely pale that morning, and he observed an abrasion on the defendant's temple. However, the defendant's demeanor could be attributable to any number of reasons. Further, there is no evidence that Perez engaged in any struggle with her killer and the Chief Medical Examiner testified at trial that none of the bullets were fired in close proximity to the victim. Thus, the abrasion on the defendant's head is not relevant to a determination of guilt.
Finally, the trial evidence established that Perez was killed by a .22 caliber firearm. The murder weapon was not recovered. In an attempt to create an inference that the defendant possessed such a weapon, the People relied on the testimony of Velez, a convicted felon. Velez testified that, around the time that the defendant voluntarily surrendered his service weapon, the defendant was looking to purchase two guns not smaller than a .38 caliber, and that he eventually told Velez that he had acquired a .38 revolver and a .22 caliber firearm with a built-in suppressor. Velez did not testify that he actually saw the guns, only that the defendant told him he had acquired them.
Taken together, the evidence presented at trial supports the possibility that the defendant was the person who killed Perez. "[H]owever, speculation and conjecture are no substitute for proof beyond a reasonable doubt" (People v Anderson, 39 NY2d 764, 765). It is not enough for the jury to determine "that the defendant is probably guilty" (Sullivan v Louisiana, 508 US 275, 278). The People must prove beyond a reasonable doubt that the defendant is the person who committed the crime. On this record, we find that the jury was not justified in finding the defendant guilty beyond a reasonable doubt.
In light of our determination, we need not reach the defendant's remaining contentions.
AUSTIN, J.P., COHEN, BRATHWAITE NELSON and IANNACCI, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court