People v Kassebaum (2020 NY Slip Op 05529)





People v Kassebaum


2020 NY Slip Op 05529


Decided on October 7, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 7, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

CHERYL E. CHAMBERS, J.P.
LEONARD B. AUSTIN
ROBERT J. MILLER
LINDA CHRISTOPHER, JJ.


2013-09079
2018-00640
 (Ind. No. 1464/13)

[*1]The People of the State of New York, respondent,
v
Richard Kassebaum, appellant.


Paul Skip Laisure, New York, NY (Kendra L. Hutchinson of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, Joseph N. Ferdenzi, and John F. McGoldrick of counsel), for respondent.



DECISION & ORDER
Appeals by the defendant from (1) a judgment of the Supreme Court, Queens County (Richard L. Buchter, J.), rendered August 15, 2013, convicting him of sexual abuse in the first degree, sexual abuse in the third degree, and criminal obstruction of breathing or blood circulation, upon a jury verdict, and imposing sentence, and (2) an order of the same court dated December 20, 2017, which denied, without a hearing, his motion pursuant to CPL 440.30(1-a) for forensic DNA testing of certain evidence.
ORDERED that the judgment is reversed, on the law and the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for further proceedings consistent with CPL 160.50; and it is further,
ORDERED that the appeal from the order is dismissed as academic in light of our determination on the appeal from the judgment.
On April 1, 2013, the defendant was arrested and, thereafter, charged with two counts of sexual abuse in the first degree (Penal Law § 130.65[1]), criminal obstruction of breathing or blood circulation (Penal Law § 121.11), and two counts of forcible touching (Penal Law § 130.52) arising from events which occurred on March 31, 2013.
During trial, the People presented testimony that, in the early morning hours of March 31, 2013, the defendant was working at a 24-hour laundromat in Queens. His shift was to end at 7:00 a.m. The complainant testified that, at approximately 4:30 a.m., she entered the laundromat. In addition to the defendant, another customer was present. The complainant recognized the defendant as an employee of the laundromat. She described their interactions as limited to greetings or when the defendant would "make change of a bill," a service that he performed for her that morning upon her arrival. The complainant testified that, while she was slightly bent over placing clothing into a washing machine, she felt someone touch her lower back above her buttocks as the person passed by. After she loaded her laundry, she told the defendant that she was leaving the laundromat temporarily and would be back.
The complainant further testified that, after she left the laundromat, she continued [*2]across 86th Avenue and walked down Woodhaven Boulevard toward her home. When she was approximately 10 steps from her home, she felt someone move her head, begin to strangle her, and squeeze her buttocks very hard. The assailant used his right arm to hurt her neck and make it difficult for her to breathe. He also knocked off her glasses. The complainant struggled and "slid down," causing the assailant to let go of her. After he let her go, she yelled and he ran away. She then picked up her glasses and called her husband, who came outside their home.
After the incident, the complainant returned to the laundromat with her husband. The police arrived shortly thereafter. Detective Lazaro Suarez Villamil met with the complainant, took her statement about the incident, and asked her to describe the assailant.
Detective Villamil testified that he memorialized the complainant's description of her assailant as "a male Hispanic, olive skin tone, five-nine in height, approximately 185 and . . . wearing: Blue T-shirt, blue jeans and black hair." Detective Villamil noted the assailant's age to be between 20 and 30, but he could not recall if the complainant provided that age or if he had.
Later that morning, the complainant met with Detective Stephen Aquaviva in front of her home. Detective Aquaviva testified that, during the complainant's discussion with him, the complainant described the assailant as approximately "five-foot-nine to, approximately, five-foot-eleven. Approximately, 200 pounds, olive complexion[, and wearing a] dark blue shirt and blue jeans." She did not indicate to Detective Aquaviva that the assailant had any tattoos.
The laundromat maintained a security video recording system. There were cameras recording activity at and near the laundromat from various views, including the interior of the laundromat, the immediate exterior of the laundromat, and the parking lot of the laundromat. The People introduced video footage from one of the cameras into evidence which showed the complainant entering the laundromat and loading her laundry. Although the complainant never indicated to the detectives that she was touched in the laundromat, the video footage showed the defendant touching the complainant as he passed her on his way out of the laundromat to smoke a cigarette. The People also introduced video footage which showed the defendant leaving the parking lot, just after the complainant left, heading in the same direction that the complainant had headed.
The laundromat's video footage depicted the defendant wearing a dark blue or black T-shirt and lighter blue jeans. Approximately two minutes after the defendant left the parking lot of the laundromat, he reappeared in the laundromat video footage, returning along 86th Avenue from the direction of 91st Street, picking up or straightening some objects in the parking lot, then re-entering the laundromat, where he made change for a customer.
At trial, the complainant testified that the assailant's skin was a "little darker" than her own. She denied ever telling the detectives that her assailant had an olive skin tone, but instead stated that she described her assailant as having the same skin tone as her husband, which is a "little darker" than her "very white" complexion. The complainant did not see the assailant's face. She did observe that the assailant had short, though "not very short," black hair and estimated that he was approximately "150 or 160 [pounds]." The complainant also testified that her assailant had no tattoos on his arms. She did not see what the detectives wrote when she described her assailant's skin tone and other features, and she did not tell them the approximate age of her assailant.
When he was arrested, the defendant was 42 years old, stood six feet, one inch tall, weighed 220 pounds, and had a distinctive tattoo on his left forearm, fair skin, and brown hair. A photograph of the defendant's profile, including his tattoo, was introduced by the People as an exhibit at trial.
At trial, the People also introduced video footage from the surveillance system of Johnny Fernandez, who lived around the corner from the laundromat. Although Fernandez authenticated the video recording that was admitted into evidence, he never testified as to the description of the person running past his house at 4:44 a.m. Under the circumstances and testimony presented, it cannot be said beyond a reasonable doubt that the "shadowy figure of defendant's stature" as described by the People in their brief was, in fact, the defendant.
At the close of the People's case, the defendant moved for a trial order of dismissal, arguing, inter alia, that there was no direct evidence demonstrating that he had anything to do with the crimes with which he was charged, that he was not identified by the complainant, and that all of the evidence was circumstantial. The Supreme Court dismissed the two counts of forcible touching, one with the People's consent, and reduced count one from a charge of sexual abuse in the first degree to a charge of sexual abuse in the third degree. With respect to the remaining counts, the court denied the motion.
At the close of all evidence, the defendant renewed his objection to the submission of count one to the jury on the ground that there was no testimony from the complainant that the defendant's contact with her inside the laundromat was of a sexual nature. The Supreme Court rejected that argument, stating, "The video shows the defendant turning his hand palm forward, and what I see on the video is that he puts his hands to her buttocks. The jury can look at that and decide based on that evidence if they find sexual contact." The court continued, "It's a question of fact for the jury because the complainant's testimony certainly is different from what I see on the video. That's why I looked at the video repeatedly to satisfy myself."
The defendant was convicted of sexual abuse in the first degree, sexual abuse in the third degree, and criminal obstruction of breathing or blood circulation. The conviction of sexual abuse in the first degree was related to the forcible grabbing of the complainant's buttocks while she was near her home. The conviction of sexual abuse in the third degree was related to the alleged sexual touching of the complainant's buttocks in the laundromat without her consent. The conviction of criminal obstruction of breathing or blood circulation was related to the impediment of the complainant's breathing during the course of the commission of sexual abuse in the first degree.
Subsequently, the defendant moved pursuant to CPL 440.30(1-a) for forensic DNA testing of certain evidence. In an order dated December 20, 2017, the Supreme Court denied the defendant's motion without a hearing. The defendant appeals from the judgment of conviction and the order dated December 20, 2017.
On appeal, the defendant contends that the evidence was legally insufficient to establish his guilt of sexual abuse in the first degree, sexual abuse in the third degree, and criminal obstruction of breathing or blood circulation, and that the verdict was against the weight of the evidence.
In evaluating whether evidence presented at trial was legally sufficient, a court must "determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial" (People v Bleakley, 69 NY2d 490, 495; see People v Contes, 60 NY2d 620, 621). Viewing the evidence in the light most favorable to the prosecution, here, there was legally sufficient evidence to support the defendant's convictions of sexual abuse in the first degree and criminal obstruction of breathing or blood circulation. The surveillance video footage showed the defendant leaving the laundromat just after the complainant had left. Both the complainant and the defendant were shown walking down Woodhaven Boulevard, and the defendant's clothing matched the complainant's description of the clothes worn by her assailant. Therefore, a rational juror could have concluded that the defendant was the perpetrator of the assault on the complainant that occurred near her home.
However, the evidence was not legally sufficient to support the defendant's conviction of sexual abuse in the third degree. A conviction of sexual abuse in the third degree requires a sexual contact without the recipient's consent (see Penal Law § 130.55). Sexual contact "means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party" (Penal Law § 130.00[3]).
Here, our viewing of the video recording taken inside the laundromat did not establish that the contact between the defendant and the complainant as he was exiting the laundromat was of a sexual nature. At best, the video was ambiguous as to the nature of the touching depicted. Indeed, the Supreme Court required several viewings of the video to reach its conclusion that a [*3]question existed as to whether this contact was sexual.
Further, the ambiguity as to this touching is not clarified by the complainant's own testimony, which does not support a finding that the contact was sexual, as her testimony did not demonstrate that the touch was not merely a consequence of the defendant passing her on the way out of the laundromat. Contrary to the complainant's trial testimony, the People argue that the defendant deliberately stroked the complainant's buttocks from bottom to top as he passed her. However, the People failed to demonstrate that the touching was for the purpose of gratifying the sexual desire of the defendant or the complainant. Therefore, the evidence presented at trial was insufficient to establish, beyond a reasonable doubt, that the defendant was guilty of sexual abuse in the third degree (see People v Yegutkin, 176 AD3d 748, 748-749).
Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we conclude that the verdict of guilt on the remaining counts was against the weight of the evidence (see People v Romero, 7 NY3d 633). "[W]eight of the evidence review requires a court first to determine whether an acquittal would not have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the [factfinder] was justified in finding the defendant guilty beyond a reasonable doubt" (People v Danielson, 9 NY3d at 348). The court "act[s], in effect, as a second jury by rendering its own determination of the facts as proved at trial" (People v Kancharla, 23 NY3d 294, 302-303 [citation omitted]; see People v Delamota, 18 NY3d 107, 116-117).
Here, the versions of the assailant's description among the complainant and Detectives Villamil and Aquaviva varied greatly and were contrary to the defendant's actual appearance and physique. According to Detective Villamil's notes, the assailant was an olive-skinned Hispanic male, measuring 5 feet, 9 inches in height and weighing approximately 185 pounds. Detective Aquaviva's notes reflected that the assailant had an olive complexion, measured between 5 feet, 9 inches and 5 feet, 11 inches in height, and weighed approximately 200 pounds. Contrary to the notes of the detectives, the complainant testified at trial, with the defendant present, that her assailant weighed approximately 150 to 160 pounds and had short black hair. Moreover, the complainant testified that her assailant did not have any tattoos on his arms. The defendant's actual appearance did not match any of these descriptions.
Further, the complainant was never asked to make an in-court identification, nor did she identify the defendant as her assailant while she was in the laundromat speaking to Detective Villamil shortly after the incident. Throughout Detective Villamil's interview with the complainant, although the defendant had been present and was known to her, the complainant never identified the defendant as her assailant.
In the face of the markedly disparate descriptions offered by the detectives and the complainant, and in the absence of an in-court identification, the verdict of the jury finding the defendant guilty of sexual abuse in the first degree and criminal obstruction of breathing or blood circulation was against the weight of the evidence (see People v Romero, 7 NY3d at 636; People v James, 179 AD3d 1095, 1096).
Accordingly, we reverse the judgment of conviction and dismiss the indictment.
In light of our determination, we need not reach the defendant's remaining contentions.
CHAMBERS, J.P., AUSTIN, MILLER and CHRISTOPHER, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court